UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
SEAN R. RAYMOND, SR.,                :
                                     :
                     Plaintiff,      :      MEMORANDUM DECISION
       -against-                     :           AND ORDER
                                     :
1199SEIU NATIONAL BENEFIT FUND,      :      20 Civ. 10380 (GBD)
                                     :
                     Defendant.      :
------------------------------------ x

GEORGE B. DANIELS, United States District Judge:

Plaintiff Sean R. Raymond, Sr. brings this suit against Defendant 1199SEIU National Benefit Fund ("NBF") under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* (Compl., ECF No. 1, at 1–3.) Plaintiff alleges that NBF failed to provide reasonable accommodations for his disability and then terminated his employment because he was disabled. (*Id.* at 4.) Before this Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 38.) Defendant's motion for summary judgment as to the discriminatory termination claim under the ADA is DENIED. Defendant's motion for summary judgment as to the failure-to-accommodate claim is GRANTED.

I. BACKGROUND

Defendant NBF is a "self-funded, non-for-profit, multiemployer Taft-Hartley trust fund" that provides health benefits to frontline healthcare workers. (Pl.'s R. 56.1 Counter Statement, ECF No. 46, ¶¶ 1, 3.) Plaintiff Raymond was an employee first hired by NBF in 1988. (*Id.* ¶ 6.) Raymond became an Outreach Coordinator in or around 2007, after holding a variety of roles in the organization. (*Id.* ¶¶ 7–8.) NBF Outreach Coordinators assist members at healthcare facilities concerning issues that relate to benefits they receive from NBF and its affiliated employee benefit funds. (*Id.* ¶¶ 11–12.) The job normally requires that Outreach Coordinators travel to the various

assigned facilities in a particular region. (*See id.* ¶¶ 11–14.) Each Outreach Coordinator, including Raymond, receives an NBF car for the exclusive purpose of traveling between assigned facilities to conduct this outreach. (*Id.* ¶ 16.)

Raymond began having health issues relating to blood clots in his left leg in 2010. (*Id.* ¶ 21.) From 2010 to 2015, Raymond worked as an Outreach Coordinator in a territory called Area I, which required the servicing of healthcare facilities in Queens and Long Island. (*Id.* ¶ 33.) In 2015, NBF reassigned Raymond to Area J, which included different healthcare facilities also in Queens and Long Island. (*Id.* ¶ 35.) Raymond went to the hospital for a swollen leg and trouble breathing in August 2015, and he was diagnosed with a pulmonary embolism that caused his hospitalization for approximately ten days. (*Id.* ¶ 24–25.) After going on short-term disability leave for approximately 26 weeks, Raymond came back to work in January 2016 with restrictions from his doctor stating that for the first four weeks following his return to work, Raymond should perform "half of the standing, walking and lifting than what he normally does" and that "sitting is advisable." (*Id.* ¶¶ 27–28.) NBF Outreach Department Director Frank Sossi informed NBF's human resources department that the outreach department could accommodate these temporary restrictions because Raymond "mostly sits" and that NBF would limit the amount of materials he carried. (*Id.* ¶ 31.)

In early December 2017, NBF decided to further reorganize responsibilities and reassigned Raymond from Area J back to Area I, in addition to reassigning several other Outreach Coordinators to different areas. (*Id.* ¶¶ 38–40.) In response to the reassignment back to Area I and upon Raymond's request, Raymond's doctor faxed a letter to NBF on December 19, 2017, stating that, among other things, Raymond must "elevat[e] his legs while sitting" and "avoid[] prolonged walking, standing, sitting, driving, and squatting." (*Id.* ¶¶ 43, 45.) On December 26,

2

2017, Raymond emailed Richard Kral—a manager in NBF's human resources department—to confirm that NBF received his doctor's letter. (*Id.* ¶ 48.) The two spoke by phone the following day to discuss the purpose or concern behind the December 19, 2017 letter. (*Id.* ¶¶ 49–50.) Raymond characterized the Area I assignment as him being reassigned to the "Hamptons" and was concerned about the reassignment's impact on his health. (*Id.* ¶ 50.) He noted the long drive to and from his home and the restrictions from his doctor regarding prolonged driving. (*Id.*)

In response, on January 12, 2018, NBF notified Raymond that he would be exempted from servicing the four Area I facilities farthest from his home. (*See* Sossi Ex. C, ECF No. 43-3.) Raymond then serviced this "modified Area I" for more than six months from January to June 2018 without incident. (Pl.'s R. 56.1 Counter Statement ¶ 60.) He then submitted another doctor's note excusing his absence from work from June 18 to 21, 2018, due to an episodic flare-up of his phlebitis with deep-vein thrombosis. (*Id.*)

After Raymond returned to work, his doctor faxed a letter on June 27, 2018, recommending that Raymond "avoid prolonged continuous standing, walking, sitting, or driving without elevating his legs *for more than thirty minutes continuously*." (*Id.* ¶¶ 61–62 (emphasis added).) On July 31, 2018, Raymond faxed a letter to NBF's human resources department, seeking a response to the June doctor's note. (*Id.* ¶ 64.) Kevin Hurley, an Assistant Director in NBF's human resources department, called Raymond that day "to find out what concern or issue Raymond thought the doctor's notes left open." (*Id.* ¶¶ 65, 68.) Raymond then "indicated his belief that because the doctor's latest note added the thirty-minute restriction on driving, it showed he could no longer drive his new assignment, the modified Area I." (*Id.* ¶ 66.) When Hurley expressed that the new doctor's note implied Raymond could not work in either Area J or the modified Area I, "Raymond shouted at Mr. Hurley that he should be given his old assignment back in Area J." (*Id.* ¶ 67.)

3

On August 6, 2018, Raymond again went out on short-term disability. (*Id.* ¶ 69.) On September 17, 2018, NBF's human resources department received updated information from Raymond's doctor, who stated that Raymond could return to work if he "avoid[ed] prolonged standing/sitting/squatting" and "heavy lifting" until January 2, 2019. (*Id.* ¶ 70; Hurley Ex. I, ECF No. 42-9.) Sossi subsequently told his NBF colleagues that the outreach department could not accommodate these restrictions because the Outreach Coordinator position "requires sitting, standing and driving for a prolonged period of time." (Hurley Ex. I.)

Then, on January 15, 2019, when Raymond returned from short-term disability and NBF informed him that he was still assigned to Area I, Raymond submitted another doctor's note confirming that he should perform only light duties, including no prolonged driving or sitting of more than 30 minutes and that these restrictions were "permanent." (*Id.* ¶ 78.) NBF stated it could not accommodate Raymond as an Outreach Coordinator pursuant to these permanent restrictions. (*Id.* ¶¶ 79–80.) Following this notification, Raymond went back on short-term disability and emailed NBF on January 17, 2019, writing, "I am prepared to return to work, but would require reasonable accommodations, which I am requesting by way of this communication." (*Id.* ¶ 82; Hurley Ex. L, ECF No. 42-12.) On January 22, 2019, NBF responded that it could not accommodate Raymond according to the doctor's restrictions, stating that the restrictions "negatively impact[ed]" Raymond's ability to conduct the essential functions of an Outreach Coordinator. (Hurley Ex. L.) NBF also notified Raymond that he would reach the 26-week maximum for short-term disability on February 5, 2019 and could apply for long-term disability benefits with The Standard Life Insurance Company of New York. (*Id.*; Pl.'s R. 56.1 Counter Statement ¶ 84.)

4

On February 1, 2019, Raymond asked for a reconsideration of his request for "reasonable accommodation[s]." (*See* Hurley Ex. M, ECF No. 42-13.) He had not requested any specific accommodation other than to return to Area J. (Pl.'s R. 56.1 Counter Statement ¶¶ 82, 86.) Raymond stated that "there [was] no medical limitation on [his] ability to perform [his] job, once he g[ot] to the required location," and expressed his willingness to consult with the human resources department about possible options for accommodations. (Hurley Ex. M.) On February 4, 2019, NBF reaffirmed that it could not accommodate Raymond because the restrictions impeded the essential functions of his job. (Weinberger Ex. J, ECF No. 41-10.) On February 6, 2019, NBF notified Raymond that it was terminating him and closing out his employment record "as a result of [his] short-term disability leave ending" the day prior. (Hurley Ex. N, ECF No. 42-14.)

The Standard Life Insurance later denied Raymond's long-term disability benefits application, finding he was not disabled. (Pl.'s R. 56.1 Counter Statement ¶ 88.) On March 24, 2020, however, the Equal Employment Opportunity Commission ("EEOC") determined based on Raymond's charge that "reasonable cause exist[ed] to believe [NBF] discriminated against [Raymond] on account of his disability in violation of ADA." (EEOC Determination, ECF No. 47-49, at 2.)

On December 8, 2020, Raymond commenced this action against NBF by alleging two causes of action under the ADA: disability discrimination and failure to accommodate. (Compl. at 4.) NBF seeks summary judgment on both of Raymond's claims, amounting to dismissal of Raymond's complaint. (Def.'s Mem. of Law on Mot. Summ. J., ECF No. 39, at 25.) Raymond opposes NBF's motion. (Pl.'s Mem. of Law in Opp'n to Mot. Summ. J. ("Opp'n"), ECF No. 44.) On June 15, 2023, this Court held oral argument on NBF's motion. (*See* Hr'g Tr., ECF No. 51.)

## II.   LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate only when there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "'material' for the purposes of summary judgment when it 'might affect the outcome of the suit under the governing law.'" *See Barlow v. Male Geneva Police Officer*, 434 F. App'x 22, 25 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is "'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008), *cert. denied*, 558 U.S. 933 (2009)). When considering a motion for summary judgment, the court must "resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996). But "mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Id.*

In determining whether a genuine issue of material fact exists, a court must construe the evidence in the light most favorable to the opposing party and draw all reasonable inferences in that party's favor. *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). However, "a court must not weigh the evidence . . . or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (quotation marks and citation omitted). Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

### B. Claims Under the Americans with Disabilities Act

Under the ADA, a qualified individual is "an individual who, with or without reasonable

6

accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Disability discrimination in violation of the ADA includes the act of "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A).

In pleading a prima facie case of disability discrimination under the ADA, Plaintiff must demonstrate (a) "that he is disabled within the meaning of the ADA or perceived to be so by his employer"; (b) "that his employer is subject to the ADA"; "(c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).

To establish a claim for failure to accommodate, Plaintiff must demonstrate that (a) he is a person with a disability under the meaning of the ADA; (b) the employer is covered by the statute and had notice of his disability; (c) with reasonable accommodations, the employee could perform the essential functions of the job at issue; and (d) the employer has refused to make such accommodations. *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015).

### III. DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE DISABILITY DISCRIMINATION CLAIM

A reasonable jury could find that Plaintiff suffered the adverse employment action of his termination due to his disability. Plaintiff has proffered sufficient evidence that he has a disability under the ADA, as well as that Defendant NBF had notice of his disability. The parties do not dispute that Defendant NBF is an employer subject to the ADA. (*See* Hurley Ex. N; Opp'n at 14.) To win on summary judgment, then, Defendant must demonstrate as a matter of law that Plaintiff

7

was not fired because of his disability. To do so, Defendant must show that Plaintiff was either *incapable* or *unwilling* to do his job, which provided a non-discriminatory reason to terminate his employment. Defendant could not have impermissibly terminated Plaintiff because of his disability. Defendant has not met this burden.

### A. Plaintiff Is Disabled Under the ADA and Was Regarded as Disabled

Under the ADA, an individual has a disability if he has (a) "a physical or mental impairment that substantially limits one or more major life activities," (b) "a record of such an impairment," or (c) is "regarded as having such an impairment." 42 U.S.C. § 12102(1). A person meets the requirement of being "regarded as having such an impairment" "if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity," as long as the impairment is more than minor and possesses "an actual or expected duration" of more than six months. *Id.* § 12102(3).

The record provides ample evidence of Plaintiff's physical impairment, of which Defendant was well aware.[1] Defendant received Plaintiff's statements and doctors' notes that conveyed Plaintiff had "a long-standing history of recurring phlebitis"; he was under "strict instructions of performing only light duties, including no prolonged driving or sitting of more than thirty minutes, no repetitive squatting, and no heavy lifting"; and "these restrictions were permanent." (Hurley Ex. J, ECF No. 42-10; Pl.'s R. 56.1 Counter Statement ¶ 78.) NBF's express acknowledgement of Plaintiff's doctor's notes and its modifications of Plaintiff's assigned territory in removing the four farthest facilities demonstrate that NBF, in the very least, "regarded [Plaintiff]

---

[1] Contrary to Defendant's arguments that Plaintiff's doctors' letters lack medical detail and that his condition was transitory, (*see* Def.'s Mem. of Law on Mot. Summ. J. at 16–18), the record is replete with medical evidence of Plaintiff's physical impairment that demonstrates Plaintiff was disabled under the ADA throughout the relevant period.

8

as having such an impairment." 42 U.S.C. § 12102(1)(C). Moreover, a thirty-minute restriction on prolonged driving and sitting is "a physical . . . impairment that substantially limits" a major life activity for practically all Americans, *id.* § 12102(1)(A),[2] and Plaintiff provided extensive doctor's notes evincing "a record of such an impairment," *id.* § 12102(1)(B). Plaintiff is thus disabled—and was perceived to be disabled—within the meaning of the ADA.

### B. Genuine Issues of Material Fact Remain as to Whether Plaintiff Was Qualified to Perform the Essential Functions of His Job With Reasonable Accommodations

Traveling distances for more than thirty minutes is an essential function of an NBF Outreach Coordinator. "The term *essential functions* means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). "[A] court must conduct 'a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice.'" *McMillan v. City of New York*, 711 F.3d 120, 126 (2d Cir. 2013) (citation omitted). Here, the Outreach Coordinator job description lists "extensive travel" as a requirement. (Pl.'s R. 56.1 Add'l Statement ¶ 5; Hurley Ex. H, ECF No. 42-8 ("The job responsibility for an Outreach Coordinator states clearly that there will be extensive travel in the Tri-State area . . . .").) In practice, Outreach Coordinators receive NBF cars for the express purpose of traveling between assigned facilities. (Pl.'s R. 56.1 Counter Statement ¶ 16.) No genuine dispute exists that Outreach Coordinators must visit their assigned institutions in the Tri-State area in order to educate and help members understand and access their benefits, with the exceptions of protocols during the COVID-19 pandemic and occasional permissions to "visit" certain facilities by phone call. (*See id.* ¶¶ 17–20; *see also* Raymond Aff., ECF No. 45, ¶ 3 ("In

---

[2] "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, *walking, standing, lifting, bending,* speaking, breathing, learning, reading, concentrating, thinking, communicating, and *working*." 42 U.S.C. § 12102(2)(A) (emphases added).

9

this role [of Outreach Coordinator], I was assigned to conduct on-site field visits at hospitals or nursing homes . . . .").)

Even with the necessity of travel, however, a reasonable jury could find that Plaintiff was qualified to perform the essential functions of his job with reasonable accommodations. Reasonable accommodation means modifications to the manner in which a position is customarily performed that enable a disabled individual to perform the essential functions of that position. 29 C.F.R. § 1630.2(o)(1)(ii). On January 12, 2018, Defendant notified Plaintiff of the accommodations that he would not be required to service his four farthest institutions, in addition to previously limiting the materials he carried. (Sossi Ex. C; Hurley Ex. C, ECF No. 42-3.) Both parties acknowledge that "Raymond serviced the modified Area I for six months without incident." (Pl.'s R. 56.1 Counter Statement ¶ 60.) Further, Kevin Hurley of NBF's human resources department stated at his deposition that Raymond "would schedule his own meetings at the institutions, and certainly if he needed additional drive time where he needed to stop mid trip, stretch his legs, get some exercise, he could certainly do so."[3] (Hurley Ex. O, ECF No. 42-15, at 26:14–19.) It is also undisputed that Raymond had consistently positive performance reviews since becoming an Outreach Coordinator. (*See* Def.'s Reply in Supp. of Mot. Summ. J., ECF No. 48, at 8; Opp'n at 2.) Therefore, a reasonable jury could find that Plaintiff was capable of performing the essential functions of his job, at least with these accommodations of servicing modified Area I and abiding by the doctor's restrictions.

---

[3] Plaintiff argues that he "easily could have performed his job . . . [had NBF] ma[de] clear that [he] could take breaks without penalty." (Opp'n at 1.) However, the record plainly demonstrates that Plaintiff controlled his daily routine, and that Plaintiff knew he did not need express permission from his employer to take breaks. (*See, e.g.*, Raymond Dep., ECF No. 47-1, at 111:17–21 (Raymond stating that working as an Outreach Coordinator entailed "[m]aking [his] own schedule").)

10

### C. Genuine Issues of Material Fact Also Remain as to Whether Defendant Terminated Plaintiff Because He Was Disabled

Defendant has also failed to proffer undisputed evidence that it terminated Plaintiff due to his inability or unwillingness to do his job or due to any other non-discriminatory reason. On January 17, 2019, Plaintiff emailed Defendant that he was "prepared to return to work" from short-term disability but "would require reasonable accommodations." (Hurley Ex. L; *see also* Pl.'s R. 56.1 Counter Statement ¶ 82.) After Defendant rebuffed him by stating that the doctor's restrictions "negatively impact[ed]" his ability "to perform the essential functions" of an Outreach Coordinator, (Hurley Ex. L), Plaintiff again contacted Defendant that "there [was] no medical limitation on [his] ability to perform [his] job, once he g[ot] to the required location," further requesting to consult with the human resources department to discuss a possible solution, (Hurley Ex. M). However, Defendant declined this appeal and terminated Plaintiff's employment prior to his return to work "as a result of [his] short-term disability leave ending." (Weinberger Ex. J; Hurley Ex. N.)

These final email communications show that it is plausible Plaintiff was willing and able to work and was attempting to find a solution that would allow him to perform his duties as an Outreach Coordinator. Therefore, a reasonable jury could conclude that Defendant terminated the qualified Plaintiff due to his disability, and not his incapability or unwillingness to perform his job.

### IV. DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON THE FAILURE-TO-ACCOMMODATE CLAIM

Defendant is entitled to summary judgment on the failure-to-accommodate claim. Plaintiff has demonstrated a disability under the ADA, and Defendant NBF—an employer covered by the ADA—had notice of his disability. *See* discussion *supra* Section III.A. However, Plaintiff cannot

establish his failure-to-accommodate claim because Plaintiff cannot demonstrate or raise a genuine dispute of material fact that during his employment Defendant refused to make reasonable accommodations.

Plaintiff bears the burden of production and persuasion as to the existence of some accommodation that would have permitted him to perform the essential functions of his employment. *Molina v. City of Rochester*, 764 F. App'x 49, 50–51 (2d Cir. 2019). "[E]mployers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Noll*, 787 F.3d at 95. Employers also have no obligation to create a new position for an employee seeking an accommodation. *See Parnahay v. United Parcel Serv., Inc.*, 20 F. App'x 53, 56 (2d Cir. 2001).

Defendant repeatedly accommodated Plaintiff's perceived disability. After Plaintiff's hospitalization and return to work in January 2016, Defendant evaluated the first doctor's note that advised Plaintiff should be "[s]itting" and perform "[h]alf of the standing, walking and lifting than what [Plaintiff] normally does." (Weinberger Ex. C, ECF No. 41-3, at 2.) Defendant found that it could accommodate Plaintiff's original request because he "mostly sits," and Defendant would limit the amount of materials he carried. (Pl.'s R. 56.1 Counter Statement ¶ 31.) When Plaintiff's doctor faxed a letter to Defendant in December 2017 stating that Plaintiff should also avoid prolonged walking, standing, sitting, driving, and squatting, Defendant exempted Plaintiff from servicing the four farthest facilities that were "about . . . 1 hour and 30 minutes away" from Plaintiff's home. (*See* Sossi Ex. C; Hurley Ex. H.) These accommodations show that Defendant responded to Plaintiff's expressed needs.

Plaintiff's only request that Defendant refused was Plaintiff's transfer back to his previous assignment of Area J. (*See, e.g.*, Pl.'s R. 56.1 Counter Statement ¶ 82 ("Raymond proposed a

route change.").). This request is not a plausible "reasonable accommodation." Plaintiff claims that the June 27, 2018 doctor's note and its inclusion of a time restriction of thirty minutes constitutes a material addition to past restrictions, demanding consideration by Defendant of a new accommodation such as his requested route change. (*See* Hr'g Tr. at 43:7–47:11.) However, as noted by Defendant, "[t]here is nothing in the record that supports Plaintiff's claim that reassignment to Area J would have accommodated his limitations, as opposed to Area I."[4] (Def.'s Reply in Supp. of Mot. Summ. J. at 5.) Plaintiff has not provided any evidence, such as a map or list of Area J's facilities with driving distances and times, that demonstrates Area J as opposed to modified Area I could have resolved issues with his revised restrictions. There is no evidence that Area J is materially different from Defendant's prior accommodation of removing the four farthest facilities in Area I.[5]

Plaintiff thus presents no evidence that Defendant refused to make any specific reasonable accommodation that was necessary to enable Plaintiff to perform the essential functions of his job as an Outreach Coordinator. Plaintiff's additional argument that he required clearer direction from Defendant that Plaintiff was allowed to take breaks, (*see* Opp'n at 1), is groundless because Plaintiff was in charge of his own travel schedule. (*See* Raymond Dep., ECF No. 47-1, at 111:17–21); *see also* discussion *supra* note 3. Moreover, Plaintiff's email to Defendant on January 17, 2019 requesting "reasonable accommodations," as well as Plaintiff's email on February 1, 2019 asking Defendant to "identify possible accommodations" for his disability, do not reveal any

---

[4] Indeed, Defendant "determined that there was no route that required less travel [from Plaintiff's home] than his assigned route." (Def.'s Mem. of Law on Mot. Summ. J. at 20.)

[5] Modified Area I consisted of 27 locations, (Hr'g Tr. at 10:22–24; Hurley Ex. H), and Area J consisted of 50 to 60 locations, (Hr'g Tr. at 18:22–19:6; Raymond Dep. at 232:16–233:4). Plaintiff conceded at oral argument that the only indication in the record that Area J might have comprised shorter routes for Plaintiff than Area I was "[j]ust his testimony." (Hr'g Tr. at 47:1–11; *see also* Raymond Dep. at 233:24–234:12 (Area J "would have been less driving.").)

*specific* accommodations that Plaintiff requested which Defendant failed to provide. (*See* Hurley Exs. L, M.) Defendant provided accommodations of removing the four farthest facilities in Area I, limiting the materials he carried, and otherwise abiding by the doctor's restrictions. Defendant was not later obligated to switch Plaintiff's routes to his most preferred choosing. *Noll*, 787 F.3d at 95 ("employers are not required to provide . . . the very accommodation most strongly preferred by the employee"). Therefore, no reasonable jury could conclude that Defendant refused to make reasonable accommodations in response to Plaintiff's requests.

## V.  CONCLUSION

Defendant's motion for summary judgment as to the discriminatory termination claim is DENIED. Plaintiff is disabled under the meaning of the ADA, and a reasonable jury could find that Plaintiff was otherwise qualified to perform the essential functions of his job with accommodations, as well as that he was terminated because of his disability.

Defendant's motion as to the failure-to-accommodate claim is GRANTED because Plaintiff cannot establish or raise a genuine dispute of material fact that Defendant refused to make reasonable accommodations during his employment. Plaintiff's failure-to-accommodate claim is DISMISSED.

The Clerk of Court is directed to close the open motion at ECF No. 38 accordingly.

Dated: July 20, 2023
      New York, New York

SO ORDERED.

*/s/ George B. Daniels*
GEORGE B. DANIELS
UNITED STATES DISTRICT JUDGE